IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: ) | |
| ) | Magistrate No. 3:21-152  MJ |
| ) | **[UNDER SEAL]** |
| One (1) black LG cellular telephone ) | |
| ) | |
| One (1) white Apple iPhone ) | |
| ) | |

**AFFIDAVIT AND APPLICATION IN SUPPORT OF A SEARCH WARRANT
BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS**

I, Brett Hinterliter, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION**

1. I, Brett Hinterliter, make this Affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the following portable electronic devices:

   a. **One (1) black LG cellular telephone; and**

   b. **one (1) white Apple iPhone**

(hereinafter referred to collectively as the **"SUBJECT DEVICES"**), and to extract from the **SUBJECT DEVICES** all electronically stored information as described in Attachment B, which constitutes evidence, fruits, and instrumentalities of violations of Title 21, United States Code, Sections 841 and 843.

2. I am a Detective with the Cambria County District Attorney's Office and have been so employed since March 2016.  Previously, I was employed by the City of Johnstown, Johnstown Police Department since January 2003, and I attained the rank of Detective in the Bureau of Criminal Investigation in August 2012.  I have served as a member of the Cambria County Drug Task Force since March 2009.

3.	Since December 2012, I have served as a Special Deputy (also known as a "task force officer" or "TFO") on the Federal Bureau of Investigation's and U.S. Marshal Service's Safe Streets Task Force ("SSTF").  By virtue of my special deputization, I am authorized to conduct investigations of and make arrests for offenses committed in violation of Title 21 of the United States Code, that is, the federal Controlled Substances Act.

4.	In addition to general training I have received over my 18-year law enforcement career, your affiant received Class "A" certification in the use of Electronic Surveillance through the Pennsylvania Office of the Attorney General in February 2014.  This certification authorizes me to conduct consensual interception of oral communications under Pennsylvania law.  Your affiant also completed course instruction in Advanced Practical Homicide Investigation.

5.	I have participated in numerous complex criminal investigations, as well as investigations of criminal organizations involved in both the manufacturing and distribution of controlled substances.  The investigations have resulted in the arrest and prosecution of individuals who have smuggled, received, and distributed controlled substances in violation of Pennsylvania and federal law.  To successfully conduct these investigations, I have utilized a variety of investigative techniques and resources including: physical and electronic surveillance, various types of infiltration (including undercover officers, informants, and cooperating sources), analysis of telephone records, witness interviews, execution of search warrants, pen register and trap and trace devices, GPS and telephone tracking devices, trash covers, pole cameras, stationary video recordings, as well as audio and audio/video recording devices, and review of financial records.  Additionally, I have personally participated as a monitor and surveillance officer in two Title III wiretap investigations, pursuant to 18 U.S.C. § 2516, in the Western District of Pennsylvania.

6. The **SUBJECT DEVICES** were seized by your affiant on April 16, 2021, at the Econolodge Motel located in Johnstown, Cambria County, Pennsylvania, from a motel room occupied by Michael KNISELY and Amanda ROBINSON. Your affiant has stored the **SUBJECT DEVICES** in secure evidence since the incident. Your affiant submits that there is probable cause to conclude that these cell phones contain evidence of drug-trafficking crimes, including violations of Title 21 United States Code, Sections 841, and 843.

7. Since this Affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause that the device described above was used in committing and containing evidence of violations of Title 21 U.S.C. §§ 841 and 843.

## APPLICABLE STATUTES AND DEFINITIONS

8. The purpose of this application is to seize evidence, fruits, and instrumentalities, more particularly described in Attachment B, of violations of Title 21, United States Code, Section 841 and 843, relating to narcotics.

9. Through my experience and training, I am aware that Title 21, United States Code, Section 841 reads, in relevant part:

(a) Unlawful Acts

Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally-

1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance; or

2) to create, distribute, or dispense, or possess with intent to distribute or dispense, a counterfeit substance.

## BACKGROUND AND TERMS RELATING TO
## NARCOTICS TRAFFICKING AND THE USE OF CELLULAR PHONES

10.     I am aware, based upon my training and experience, that the cell phone, in addition to weapons, is a primary tool of the drug trade.  Drug traffickers must maintain telephone listings of the numbers for customers and suppliers to efficiently conduct their drug trafficking business.  Often sent or received text messages and call logs reflecting sent or received calls to/from customers and/or suppliers are stored on cell phones.  The data on current or past cell phones can be particularly strong evidence of drug trafficking and, at the very least, can link a particular drug trafficker to prior communications setting up and/or completing prior drug transactions.

11.     Moreover, drug traffickers commonly possess and use multiple cellular telephones simultaneously to conduct their drug trafficking activities and must keep these telephones in their actual (on their persons) or constructive (in their vehicles, residences, and businesses) possession to have ready access to them.  It is common for these cellular telephones to be retained, although not necessarily used, for months or longer by drug traffickers in their vehicles, residences, and businesses.  Drug traffickers often do not discard their cellular telephones immediately after they stop actively using them.  Therefore, while it is common for drug traffickers to stop using cellular telephones frequently, it is far less common for drug traffickers to discard their cellular telephones after they switch to new cellular telephones.  As a result, I am aware that collections of cell phones have been found during drug trafficking search warrants that have included cell phones that were no longer being used by a particular drug trafficker but had nevertheless been retained.

12.     I am also aware that drug traffickers sometimes take trophy photographs of their drugs, drug proceeds, and firearms and retain the photographs in their residences or on their

computers, cell phones, cameras, or other electronic storage devices. I am also aware that drug traffickers, like law-abiding citizens, sometimes take photographs of themselves with their friends, relatives, and associates and keep the photographs in their residences. When they are taken or retained by drug traffickers, such photographs can be evidence, or can lead to evidence, of drug trafficking and money laundering by identifying closely associated people who are actively assisting and/or supporting the drug trafficking activity.

13. It is now not uncommon for drug traffickers to have email accounts or various apps for cell phones that facilitate communications as well as the acquisition and expenditure of drug trafficking proceeds. Evidence of drug crimes can be found in the cell phones/computers/electronic media referenced in the preceding paragraphs. Such evidence can include internet searches for drug-related paraphernalia, addresses, or telephone numbers, as well as incriminating communications via emails or instant messages. It should be noted that, with the advance of technology, the distinction between computers and cellular telephones is quickly becoming less clear. Actions such as internet searching or emailing, in addition to calling and text messaging, can now be performed from many cell phones. In addition, those involved in drug trafficking crimes commonly communicate using multiple cellular telephones. Simultaneous possession of multiple cellular telephones is, therefore, evidence of drug trafficking. Moreover, the particular numbers of, and the particular numbers dialed by, particular cellular telephones can be evidence of drug trafficking. Such numbers can confirm identities of particular speakers and the occurrence of certain events.

14. As with most electronic/digital technology items, communications made from an electronic device, such as a computer or a cell phone, are often saved or stored on the device. Storing this information can be intentional, for example, by saving an e-mail as a file on a

computer or saving the location of one's favorite websites in "bookmarked" files. Digital information can also be retained unintentionally.

15.     Traces of the path of an electronic communication or of an internet search may be automatically stored in many places on a computer or a cell phone. In addition to electronic communications, a user's Internet activities generally leave traces in the web cache and Internet history files. A forensic examiner often can recover evidence that shows when and in what manner a user of an electronic device, such as a computer or a cell phone, used such a device.

16.     Electronic files or remnants of such files can be recovered months or even years after they have been downloaded, deleted, or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when such files have been deleted, they often can be recovered months or years later using readily available forensic tools. When a person "deletes" a file on an electronic storage device such as a computer, the data contained in the file often does not actually disappear; rather, that data often remains on the device until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on a device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are often automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from an electronic storage device depends less on when the file was sent, downloaded, or viewed than on

a particular user's operating system, storage capacity, and habits.

17. Based on my training and experience, I am aware that each of the following parts of a cell phone is likely to contain evidence of the crimes referenced herein. Such evidence can extend beyond evidence that directly establishes what crime was committed and by whom to evidence that establishes who used the cell phone and/or when and/or from where. Such cell-phone attribution evidence is particularly important because it links the user of the subject cell phone to the substantive evidence on the subject cell phone; it can link other users of other cell phones to the substantive evidence on the subject cell phone; and it can link the user of the subject cell phone to the location where the subject cell phone was found or where the subject cell phone was previously located based on location information stored on the cell phone. Moreover, parts of a cell phone that demonstrate the use of the cell phone to perform functions beyond communicating and recording photos/videos, such as to search the Internet or find addresses/directions, can be important to an investigation of the crimes referenced herein because cell phones are frequently used to prepare for crimes (e.g., to shop for tools of the particular criminal trade) and to complete individual criminal acts (e.g., travel to/from the location of the particular crime).

(1) incoming and outgoing call and text message logs
(2) contact lists
(3) photo and video galleries
(4) sent and received text messages
(5) online searches and sites viewed via the internet
(6) online or electronic communications sent and received, including email, chat, and instant messages

(7) sent and received audio files

(8) navigation, mapping, and GPS files

(9) telephone settings, including speed dial numbers and the telephone number for the subject telephone and related identifying information such as the ESN for the telephone

(10) call forwarding information

(11) messages drafted but not sent

(12) voice messages

## FACTS ESTABLISHING PROBABLE CAUSE

18. On April 15, 2021, a Cambria County Sheriff's Deputy received a tip from a known, reliable and credible source of information that Tiffany Ridenour, a wanted fugitive, was staying with a male named Michael KNISLEY in Room 315 of the Econolodge motel in Johnstown. At approximately 9:00 a.m. the next morning (April 16, 2021), members of the Cambria County Sheriff's Fugitive Task Force responded to the hotel room and knocked on the door. A female answered but refused to identify herself to the deputies. While engaged with the female at the doorway, deputies noticed movement on the bed. One deputy stepped into the room and directed the individual on the bed to place their hands in the air. Upon doing so, the deputy noticed that the individual on the bed was a male. The deputy asked the male to identify the female who had answered the door. The male stated that her name was "Amanda." The deputy told the male that they were there because they had received a tip that Tiffany Ridenour was staying in the room with a male named Michael KNISELY. The male told the deputy that he did not know Ridenour, but that Amanda did. While speaking with the male, the deputy noticed a syringe and a spoon with white residue on it on top of the nightstand. The deputy

asked the male if he could look around the room to see if Ridenour was there. The male agreed. Deputies performed a quick sweep of the room and did not locate Ridenour. The deputy then asked the male if he had any identification on him. The male stated that his ID was in his wallet on the nightstand. The deputy asked the male for permission to retrieve the male's wallet for him. The male agreed. As the deputy bent down to pick up the wallet, he noticed several bundles of suspected heroin next to it. The male, who was identified as Michael KNISELY and the female, who was later identified as Amanda ROBINSON, were detained.

19. The sheriff's deputy contacted your affiant to respond to the scene. Your affiant arrived a short while later and requested consent to search the motel room. Both KNISELY and ROBINSON provided verbal consent and executed a written consent to search form. During the search of the motel room, I located a quart-size bag containing suspected methamphetamine, multiple digital scales, packaging materials, various quantities of U.S. currency totaling $10,274, small quantities of suspected heroin, and indicia for KNISELY and ROBINSON. KNISELY and ROBINSON were placed under arrest and verbally advised of their Miranda rights. Motel information showed that the room was rented in KNISLEY's name.

20. Your affiant transported KNISLEY and ROBINSON for interviews. Prior to interviewing both KNISLEY and ROBINSON, I re-read Miranda warnings to each of them. Both KNISLEY and ROBINSON indicated that they wished to waive their Miranda rights and speak with me. Both KNISLEY and ROBINSON executed written Miranda waiver forms and submitted to audio-recorded interviews.

21. I interviewed ROBINSON first. During the interview, ROBINSON stated that the large quantity of methamphetamine belonged to KNISELY, but admitted that she knew it was present and that she had met people at the motel to complete drug sales. She advised that

there would likely be communications contained within her cell phone evidencing these drug sales. At the conclusion of the interview, ROBINSON provided written consent to search her cell phone. However, whether intentionally or inadvertently, she provided an incorrect PIN for the device.

22. I next interviewed KNISLEY. KNISELY admitted that the large quantity of methamphetamine belonged to him, but that both he and ROBINSON were engaged in selling it. KNISELY, too, indicated that there would be evidence of drug sales located in his cell phone. At the conclusion of the interview, KNISLEY provided consent to search his cell phone.

23. Following the arrest of KNISELY and ROBINSON, the suspected methamphetamine was sent to the Pennsylvania State Police crime lab for testing. Lab results confirmed that the suspected methamphetamine weighed 628 grams and contained methamphetamine. The suspected heroin seized during the consent search was tested as well. Testing revealed that the stamp bags included a 0.31 gram quantity of fluorofentanyl, 0.54 grams of a heroin/fentanyl mixture, 0.33 grams of cocaine, and 0.25g of a meth/heroin mixture.

## SEARCH METHODOLOGY TO BE EMPLOYED

24. The search procedure of electronic data contained in hardware, software, and/or memory storage devices of the cellular phones listed in Attachment A may include the following techniques (the following is a non-exclusive list, as other search procedures may be used):

   a. examination of all of the data contained in such computer hardware, computer software, and/or memory storage devices to view the data and determine whether that data falls within the items to be seized as set forth herein;

   b. searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth

herein;

c. surveying various files directories and the individual files they contain;

d. opening files in order to determine their contents;

e. scanning storage areas;

f. performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are likely to appear in the evidence described in Attachment B; and/or

g. performing any other data analysis technique that may be necessary to locate and retrieve the evidence described in Attachment B.

## CONCLUSION

25. Based upon the information above, your Affiant has probable cause to believe that violations of Title 21, United States Code, Sections 841, have been committed, and that the items described in Attachment B, which are evidence, fruits, and instrumentalities of those violations, will be found in the items described in Attachment A by performing any other data analysis technique that may be necessary to locate and retrieve the evidence described in Attachment B.

26. By this Affidavit, I request that the Court issue warrants authorizing the search of the **SUBJECT DEVICES.**

27. Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

28. Additionally, your Affiant respectfully requests that the Court issue an order

sealing, until further order of Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing the documents is necessary because they relate to an ongoing investigation, and not all of the targets of this investigation have yet been arrested or indicted. Additionally, this Affidavit contains sensitive information. Your Affiant submits that premature disclosure of the contents of this Affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness by causing the targets of the investigation to possibly destroy or conceal evidence, flee, or otherwise grow more circumspect in their criminal activities.

  The above information is true and correct to the best of my knowledge, information and belief.

*/s/ Brett Hinterliter*
Brett Hinterliter
Special Deputy
FBI Safe Streets Task Force

Sworn and subscribed before me, by telephone
pursuant to Fed. R. Crim. P. 4.1(b)(2)(A),
this __22nd__ day of September, 2021.

_____
HONORABLE KEITH A. PESTO
United States Magistrate Judge